UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

Mary Hammock,                              :        Case No. 1:12-cv-250
                                           :
      Plaintiff,                       :
vs.                                        :
                                           :
Commissioner of Social Security,           :
                                           :
      Defendant.                       :

## ORDER

This matter is before the Court on the Commissioner's objections to the

Magistrate Judge's Report and Recommendation.  (Doc. 16)  The Magistrate Judge has

recommended that the Commissioner's final decision denying Plaintiff's application for

Social Security disability benefits be reversed, and the case remanded to the

Commissioner pursuant to Sentence Four of 42 U.S.C. §405(g).  (Doc. 14)  The

Magistrate Judge concluded that the ALJ failed to sufficiently explain the weight he gave

to Plaintiff's treating source opinions, and improperly evaluated Plaintiff's credibility.  For

the reasons that follow, this Court adopts the Magistrate Judge's recommendations, and

vacates the Commissioner's final decision.

## BACKGROUND

Mary Hammock filed an application for disability insurance in February 2009,

alleging a disability onset date of December 12, 2008 based on a combination of

physical and mental impairments.  Hammock was 24 years old on her alleged onset

date.  Her application was denied initially and on reconsideration, and she sought an

evidentiary hearing which the ALJ conducted on November 19, 2010.  Hammock

appeared with counsel and testified about her limitations.  The ALJ also elicited

testimony from a vocational expert.  (TR  25-68)

Hammock is 5 foot, 2 inches tall and weighed 256 pounds at the time of the

hearing.  Her initial disability application stated: "I cannot move well due to weight and

arthritis. My anxiety and panic attacks cause me to be short of breath and vomit.  The

severe pain from the arthritis adds to my anxiety and depression."  (TR 156)  She was

terminated in 2008 from her job as a pre-school teacher's assistant because she could

not perform the job's physical requirements; that is, she could not sit with her students

or run after them.  Her employer's termination letter confirms this assertion, and further

states that she reported being very stressed by the demands of the job.  (TR 246)   In

her initial symptoms report, Hammock stated that she has extreme pain, weakness and

fatigue, and cannot sleep properly due to pain.  Sitting or moving for more than 15

minutes aggravates her symptoms, and pain increases when she walks or moves for

more than 30 minutes at a time.  (TR 181)  She assessed her pain level as 8 out of 10

on a "good day," which she has two days per week, and as 10 out of 10 on a "bad day."

(TR 182)  She also reported weakness and fatigue due to pain as 10 out of 10 on "bad"

days (which was almost every day).  In a typical day, she reported that she takes a

shower, gets dressed, cleans house and cooks, but needs frequent breaks to sit down.

She goes to appointments or to her father's house, where she watches TV.[1]  She feeds

and walks her dog, but noted that her friend helps with walking when she is in too much

---

[1] Hammock testified at the ALJ hearing that she moved in with her father in the spring of 2009 because she could no longer afford to keep her apartment.  (TR 50)

pain. (TR 189) She reported that she must sit down in order to put her clothes on, as lifting her arms causes her shoulder pain. She cannot stand in the shower longer than 15 minutes, and has difficulty washing her hair due to shoulder pain. She also reported shopping for groceries once a week, and her hobbies include movies, playing cards, and attending car races, although she has difficulty moving or sitting. (TR 191-192)

Dr. Theodore Hunter is Hammock's primary care physician. The record includes his office records beginning in October 2008, and it is not clear whether Hammock was seeing Dr. Hunter before that date. On that visit, her problems were identified as allergies, obesity, anemia, arthritis in her knees and hips, anxiety and panic attacks, and psoriasis. Her current medications were lopressor, alprazolam, and ultram. She reported that her shoulders hurt with lifting, that she has had problems taking aspirin and Celebrex, and that her last knee x-rays were four years ago. (TR 249) Dr. Hunter noted that her strength was 5/5 in upper and lower extremities, but she had psoriatic lesions on her ears and neck. Hammock visited the ER on December 8, after a routine visit with her gynecologist revealed significantly elevated blood pressure, and her doctor told her to go to the emergency room. An xray of her head showed no abnormalities (TR 239), and she saw Dr. Bhargava (in the same practice with Dr. Hunter) the next day, December 9. She complained of behavioral changes and anxiety, and was very stressed by work and by the approaching anniversary of the deaths of her mother and brother. She was started on Xanax, and Dr. Bhargava noted that an SSRI would be prescribed if Xanax was ineffective for her anxiety. (TR 259) She saw Dr. Hunter again on December 23, stating she had lost her job, was anxious and stressed, and her BP was still high. Dr. Hunter increased her BP medications and planned to see her

again in three months.  (TR 262)

Dr. Hunter completed an RFC assessment in February 2009, diagnosing arthritis of the knees, hips, shoulders, wrists and fingers; obesity; generalized anxiety with panic attacks; seasonal rhinitis; and psoriasis.  He concluded that Hammock can sit for no more than one hour, and can stand/walk no more than 15 minutes at a time and for two hours intermittently through a day.  Under "observations," he noted that she cannot sit or stand, and that shoulder and wrist pain affects her arm movement.  He further opined that Hammock cannot lift any weight at all, and that her impairments are expected to last longer than 12 months.  (TR 267-268)

Dr. Hunter referred Hammock to Dr. Greenblatt, a rheumatologist at the Deaconess Arthritis Center, due to her consistent knee and shoulder pain and psoriasis.  Greenblatt ordered radiology studies of her knees, which revealed tricompartmental osteoarthritic changes bilaterally, but significantly worse on the left.  (TR 340)  On September 18, 2009, after informing her of potential risks, he started her on Methotrexate to treat her probable psoriatic arthritis.[2]  He noted at that visit that she had normal gait and posture, no evidence of overt muscle wasting, and large plaque psoriasis on her back, arms and legs.  (TR 341)  At the February 25, 2010 visit, Dr. Greenblatt increased her Methotrexate dosage due to continued arthritis pain and

---

[2] Psoriatic arthritis is a form of arthritis that accompanies psoriasis, and causes joint pain, stiffness and swelling.  The disease flares and alternates with periods of remission, and symptoms can range from mild to severe.  No cure exists, and without treatment it may be disabling.  Methotrexate is commonly used to treat psoriatic arthritis, but "it has potentially serious side effects, including lung, kidney and liver problems."  See http://www.mayoclinic.com/health/psoriatic-arthritis/DS00476, last accessed August 2, 2013.

significant morning stiffness.  At that time he noted soft tissue swelling around her wrist and on her knees, with the right knee more than the left.  (TR 342)

Hammock continued to see Dr. Hunter at regular intervals.  On November 9, 2009, she reported to Hunter that she had started Methotrexate and that it helped with her psoriasis; she was also seeing a psychologist which she reported as helpful.  She told Hunter that she still has three panic attacks a week, but was learning "to deal with it." (TR 371)  Dr. Hunter noted that her anxiety, arthritis and psoriasis were "improved" and continued her medications.  On April 13, 2010, she reported to Hunter that she had some chest pains with panic attacks, and was having nightsweats.  Her arthritis was still hurting, but she could not see Dr. Greenblatt due to an insurance problem.  Her psoriasis was better but her panic attacks were worse, and she continued to see the psychologist, which was both "good and bad."  Dr. Hunter prescribed Norco for pain and Ambien to help her sleep, and noted her symptoms were unchanged.  (TR 384)  She had additional visits with Dr. Hunter on June 17, July 13, and October 18, 2010, at which time she reported she was "very depressed" and still taking Paxil, but could not continue to see the psychologist because of a lack of insurance.  (TR 391)

Dr. Hunter completed a second RFC assessment on November 18, 2010, listing diagnoses of arthritis, obesity, psoriasis, generalized anxiety, and depression.  (TR 400)  He concluded at that time that Hammock cannot stand for more than 15 minutes, and can sit for 30 minutes; she can work for one hour per day and can occasionally lift up to 5 pounds.  He further opined that Hammock can never stoop, could occasionally raise her arms and use her hands, and would need to elevate her legs most of the time during an 8-hour work day.  Dr. Hunter also completed the psychological portion of the

RFC form, finding Hammock to be markedly impaired in her ability to understand, remember and carry out detailed instructions and in her ability to work with others, and moderately impaired in all other areas.

### Dr. Ahmed

In mid-2010, Hammock saw Dr. Abdul Ahmed, an orthopedist, after she fell and hurt her knee. Dr. Ahmed performed surgery on both knees on July 20, 2010; his operative report states that Hammock has chondromalacia in both knees, a lateral tear of the meniscus in her left knee and a degenerative tear in the lateral meniscus of her right knee. (TR 344) Dr. Ahmed saw Hammock for several post-surgery visits, and he completed a functional assessment in November 2010 after she completed a course of 18 sessions of physical therapy. He opined that due to degenerative joint disease in her knees, Hammock can stand for no more than 15 minutes at a time, and cannot sit for more than 2 hours; can lift up to 5 pounds frequently; and has no need to elevate her legs during an 8-hour work day. He further opined that Hammock is incapable of working, and that she will need a knee replacement in the future. (TR 396-397)

### Dr. Zarnowiecki

Clinical psychologist Susan Zarnowiecki provided outpatient therapy to Hammock for 13 visits over the period September 2009 to April 2010. (TR 399) Her treatment was interrupted several times due to changes or lapses in Hammock's insurance, but Hammock reported to Dr. Hunter that therapy was helpful. (11/2/09, TR 370; 4/13/10, TR 383) Dr. Zarnowiecki completed an RFC assessment on November 17, 2010, finding that Hammock is moderately impaired in her ability to understand, remember and carry out detailed instructions; to work with others; to interact

appropriately with the general public; and to accept supervision and to get along with co-workers.  (TR 398-399)  Dr. Zarnowiecki commented that "it would be difficult for Mary to manage job demands" and that "[s]he regularly complained of pain, sometimes being unable to leave her house.  No testing was done."  (TR 399)

At the evidentiary hearing before the ALJ, Hammock testified that her psoriasis is both painful and a source of embarrassment, and that stress worsens that condition. She developed arthritis at age 16 and it has grown worse over time.  The medication helps with the pain levels, but even on medication she has trouble grasping or lifting things.  She stated that Methotrexate makes her very drowsy.  She also described frequent panic attacks that cause her breathing and heart rate to increase, and at times cause her to vomit and shake.  She can sleep at night for about an hour at a time, and often wakes up due to pain.  (TR 52-60)

On December 10, 2010, the ALJ denied Hammock's application.  (TR 11-20) The ALJ determined that Hammock has severe impairments of arthritis, psoriasis, obesity, degenerative joint disease status post meniscal tear of the knees, depressive disorder, generalized anxiety disorder, headaches, and panic disorder.  (TR 13)  He determined that none of these impairments, alone or in combination, met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. The ALJ then found that Hammock retained the residual functional capacity to perform sedentary work but with the following restrictions:

> [S]he needs to avoid climbing ladders/ropes and scaffolds.
> The claimant can occasionally climb stairs and ramps, can
> occasionally balance, stoop and crouch, can frequently
> reach overhead, handle and finger, and should avoid
> kneeling and crawling.  In addition the claimant can sustain

> moderate exposure to excessive or unexpected noises, and
> should avoid concentrated … exposure [to] extreme cold,
> irritants such as fumes, dust, odors and gases, poor
> ventilation, unprotected heights and moving machinery.  The
> claimant retains the mental capacity for simple, routine and
> repetitive tasks that are unskilled and require low stress work
> in an environment that is free of fast pace and has few, if any
> work place changes, no interaction with the general public,
> occasional contact with coworkers and supervisors, and
> requires no tandem tasks with co-workers.

(TR 15)

The ALJ summarized Hammock's hearing testimony describing her psychological
and physical limitations, including depression, difficulty focusing, panic attacks, and
difficulty standing, sitting, walking, gripping, and bending.  He found that her
impairments could reasonably be expected to cause her reported symptoms, but that
her statements concerning the intensity, persistence and limiting effects of her
symptoms were not credible to the extent they conflicted with his RFC assessment.  He
cited the following record evidence:

> In terms of the claimant's alleged symptoms, a December
> 2008 treatment note shows that the claimant reported
> headache pain but denied double or blurred vision, neck pain
> or stiffness, shortness of breath, nausea, vomiting,
> numbness, tingling or paralysis.  At that time, the claimant
> was well-oriented and demonstrated intact sensation and
> normal motor strength and had a normal neurological
> examination.  Also, a CT scan of the head showed no acute
> disease (Exhibit 1F).  A March 2009 progress note from
> Heritage Health Alliance shows that the claimant presented
> as obese, well developed and in no acute distress, had intact
> sensation, normal upper and lower extremity strength, and
> denied problems sleeping (Exhibit 3F).  Subsequent notes
> reveal that the claimant was referred to a rheumatologist for
> her complaints of joint pain, presented in no acute distress,
> and was prescribed anti-anxiety medication by her primary
> physician, Dr. Hunter (Exhibits 9F and 10F).  Reports from
> Dr. Greenblatt reveal that the claimant had radiological

evidence of tricompartmental osteoarthritic changes bilaterally significantly worse on the left but that the claimant demonstrated normal gait and posture and normal hygiene (Exhibit 17F).  In July 2010, the claimant underwent arthroscopic excision of plica, chondroplasty and partial lateral meniscectomy of the right knee, and arthroscopic chondroplasty of the left knee (Exhibit 8F).  Two months post-operatively, the claimant reported feeling better, was described as being in no acute distress, ambulated toe touch on crutches, had mild tender swelling, was receiving physical therapy, and had good range of motion and only mild ecchymosis and swelling (Exhibit 19F).  In November 2010, the claimant presented in no acute distress, had equal strength in upper and lower extremities, and having improved arthritis and psoriasis (Exhibit 20F).

(TR 16)

The ALJ then addressed the state psychological consultative exam by Dr. David Chiappone in May 2009.  Dr. Chiappone noted that Hammock displayed adequate motor behavior, and did not exhibit pain behaviors or complain about pain.  Dr. Chiappone's summary and conclusions state:

Ms. Hammock presented as having panic disorder, generalized anxiety, depression, and a number of physical problems. ... [It] is my opinion that Ms. Hammock is not impaired in her ability to understand and remember simple one and two-step job instructions.  She is moderately impaired in her ability to maintain concentration and attention. ... Her anxiety would interfere with concentrating over time.  She's moderately impaired in her ability to relate to co-workers, supervisors, and the public.  She comes across as being anxious and unsure of herself and she would have difficulty dealing with give and take.  She's moderately impaired in her ability to carry out and persist over time due to depression and anxiety.  She has moderately impaired stress tolerance. ... GAF for symptoms and functional level is 51.

(TR 273)

In discussing Hammock's treating physicians' opinions, the ALJ gave little weight

-9-

to Dr. Hunter's 2009 assessment. Although he did not refer to Dr. Hunter by name,[3] the ALJ concluded that the assessment " … clearly overstates the claimant's limitations as evidenced by the medical and objective findings." (TR 17) The ALJ discounted Dr. Hunter's second assessment, assigning it "... little weight based on Dr. Hunter's treatment, which has been conservative, and his conclusions in his treating notes that the claimant's anxiety, psoriasis and arthritis were stable (Exhibit 20F)." (TR 18) He also cited Hammock's statements to Dr. Hunter during her October 2010 visit that due to insurance problems, she was not seeing her psychologist, and her November 2009 report that she was learning "how to deal with" panic attacks. The ALJ gave little weight to Dr. Ahmed's opinion, finding that it also overstated Hammock's limitations "... as evidenced by the medical and objective findings." (TR 17) The ALJ noted that his residual functional capacity assessment "... allows for significant limitations in postural and functional activities, which are more consistent with the medical record as a whole." (TR 17)

The ALJ also concluded that inconsistencies in the record undermined the credibility of Hammock's descriptions of her pain and limitations:

> The objective medical evidence does not support the nature and extent of the claimant's subjective complaints, that is, total disability. While the claimant's impairments cause significant functional limitations, the residual functional capacity accommodates those limitations. The claimant alleged daily panic attacks over the last three years, however, the record does not support her allegation. The claimant also alleged that she isolates herself and spends 6

---

[3] There was some confusion at the start of the evidentiary hearing about who signed the 2009 RFC assessment (Exhibit 4F), but the ALJ acknowledged on the record that it was Dr. Hunter. (TR 30)

> days out of the week alone, however, the record does not
> support those allegations either. ... As stated above, the
> claimant's physical examinations also routinely showed the
> claimant was neurologically intact with no muscle wasting,
> good strength and normal sensation. The claimant was also
> able to tend to her personal care, including dressing and
> showering, is able to clean and cook, albeit slowly and in a
> protracted fashion, and is able to go shopping once a week.

(TR 17) The ALJ observed that during part of the period of alleged disability, Hammock had lived in an apartment with friends; that she did some household chores, visited relatives, took care of her dog, went grocery shopping, went to the movies, and attended car races. He also noted her testimony that she has no relationship with her brother or his family, but she told Dr. Chiappone that her nephew drove her to the examination and she wanted him to stay with her during the interview, and she reported during an ER visit that a young nephew may have exposed her to diarrhea. (TR 349)

The ALJ gave "great weight" to Dr. Chiappone's assessment and to the state psychological consultants' reviews that followed Dr. Chiappone's report, finding they were supported by the objective evidence and were consistent "with the claimant's pleasant and cooperative presentation, as well as her ability to maintain relations with her nephew and family." (TR 18) The ALJ gave Dr. Zarnowiecki's opinion "some weight" in view of the treating relationship and because it did not indicate "significant" limitations; but he rejected Dr. Zarnowiecki's conclusion that "it would be difficult for the claimant to manage job demands." (TR 18)

The ALJ then concluded that Hammock could not perform her past relevant work as a teacher's aide, dry cleaning associate, or office manager. Based upon his RFC assessment and the hearing testimony of the vocational expert, he ultimately concluded

that she could perform other jobs that exist in significant numbers in the national economy, including positions as an inspector or sorter, and therefore was not disabled. The Appeals Council denied Hammock's request for review, and she timely filed her complaint in this court.  Hammock contends that the ALJ erred (1) by failing to explain why he did not give controlling weight to the opinions of her treating physicians and psychologist; and (2) in unfavorably assessing her credibility.

## STANDARD OF REVIEW

Under 42 U.S.C. §405(g), this Court reviews the Commissioner's final decision by determining whether the record as a whole contains substantial evidence to support that decision.  "Substantial evidence means more than a mere scintilla of evidence, such as evidence a reasonable mind might accept as adequate to support a conclusion." LeMaster v. Secretary of Health and Human Serv., 802 F.2d 839, 840 (6th Cir. 1986) (internal citation omitted).  The evidence must do more than create a suspicion about the facts; it must be sufficient to withstand a motion for a directed verdict when the conclusion sought to be drawn from that evidence is one of fact for the jury. Id.  If the ALJ's decision is supported by substantial evidence, the Court must affirm that decision even if it would have arrived at a different conclusion based on the same evidence.  Elkins v. Secretary of Health and Human Serv., 658 F.2d 437, 438 (6th Cir. 1981).

The district court reviews de novo a Magistrate Judge's Report and Recommendation regarding Social Security benefits claims. Ivy v. Secretary of Health & Human Serv., 976 F.2d 288, 289-90 (6th Cir. 1992).

**ANALYSIS**

1. <u>Weight Given to Medical Opinions</u>.

Hammock contends that the ALJ erred in discounting her treating physicians'

assessments of her functional capacity. Under applicable Social Security regulations, a

treating physician's opinion is accorded controlling weight if it is "well-supported by

medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with other substantial evidence in [the] case record[.]" <u>Rogers v.</u>

<u>Commissioner of Social Sec.</u>, 486 F.3d 234, 242 (6th Cir. 2007). The regulations

provide that, in considering any medical opinion, "... the more consistent an opinion is

with the record as a whole, the more weight [the ALJ] will give to that opinion." 20

C.F.R. §416.927(d)(4). More weight is generally given to an examining source than to a

records reviewer, but the weight accorded to any medical opinion must be based on the

evidence that supports the opinion, and its consistency with the record as a whole. The

ALJ need not accept a medical opinion that a claimant is "disabled" or unemployable, as

that determination rests with the Commissioner pursuant to 20 C.F.R. §416.927(e)(1).

If controlling weight is not given to a treating physician's opinion, the ALJ must

explain the weight given to that opinion by evaluating several factors, including the

length, frequency, nature, and extent of the treatment relationship; the supportability

and consistency of the physician's conclusions; the specialization of the physician; and

other relevant factors. "However, in all cases there remains a presumption, albeit a

rebuttable one, that the opinion of a treating physician is entitled to great deference, its

non-controlling status notwithstanding." <u>Rogers</u>, 486 F.3d at 242 (citing Soc. Sec. Rul.

96–2p, 1996 WL 374188, at *4). The ALJ must identify specific reasons for discounting

-13-

a treating physician's opinion, reasons that are

> ... sufficiently specific to make clear to any subsequent
> reviewers the weight the adjudicator gave to the treating
> source's medical opinion and the reasons for that weight. ...
> Because of the significance of the notice requirement in
> ensuring that each denied claimant receives fair process, a
> failure to follow the procedural requirement of identifying the
> reasons for discounting the opinions and for explaining
> precisely how those reasons affected the weight accorded
> the opinions denotes a lack of substantial evidence, even
> where the conclusion of the ALJ may be justified based upon
> the record.

Id. at 242-243 (internal citations and quotations omitted).

The Sixth Circuit has repeatedly enforced this procedural requirement, and has required a specific explanation of the weight given by an ALJ to the opinions of a treating physician. See Cole v. Astrue, 652 F.3d 653 (6th Cir. 2011), remanding the case to the Commissioner when the ALJ accepted the treating psychiatrist's diagnosis of major depression because it was consistent with the record, but rejected that psychiatrist's resulting RFC assessment without assigning a specific weight to that opinion. The court noted that the ALJ's decision not to give controlling weight to a treating source does not mean that the source's RFC assessment should be rejected without a full explanation of the factors used to determine the appropriate weight it should be given. See also, Gayheart v. Commissioner, 710 F.3d 365 (6th Cir. 2013), finding that the ALJ failed to state good reasons for not assigning controlling weight to a treating psychiatrist's opinion and assessment, and failed to identify the specific evidence he found to be inconsistent with that opinion; and Hensley v. Astrue, 573 F.3d 263 (6th Cir. 2009), vacating and remanding a decision denying benefits, and noting that "[w]e do not hesitate to remand when the Commissioner has not provided 'good

-14-

reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned to a treating physician's opinion." Id. at 267 (internal citation omitted).

Here, the Magistrate Judge concluded that the ALJ failed to adequately explain the basis upon which he declined to give controlling weight to the opinions of Dr. Hunter and Dr. Ahmed.   The Commissioner objects, arguing that the ALJ summarized their records and cited their observations of normal extremity strength, normal neurological exams, and normal gait and posture.  While the ALJ cited some of the record evidence (as quoted above), his decision does not satisfy the requirements set forth by the Sixth Circuit.  The ALJ rejected Dr. Hunter's first assessment because it overstated the "medical and objective findings."  (TR 17)  But that conclusion does not explain what findings existed at that time, and it does not address the factors set forth in the regulations, such as the length of the treating relationship.

The ALJ rejected Dr. Hunter's November 2010 assessment because his treatment had been "conservative" and because he noted that her severe impairments (anxiety, psoriasis, and arthritis) were "stable."  He also rejected Dr. Ahmed's assessment on similar grounds, but did not cite the specific clinical findings or review the factors set forth in the regulations.  Moreover, a "stable" condition in chronic impairments such as arthritis does not equate to a conclusion that the impairments are not disabling.  And it is not apparent from the record that more aggressive treatment was appropriate or even available for Hammock's arthritis or psoriasis.

The Commissioner also argues that the ALJ was entitled to ignore or discount Dr.

Hunter's psychological assessment in his November 2010 opinion because he is not a psychologist.  But the ALJ did not reject that portion of the RFC assessment on that basis, or on any basis; it was simply not addressed by the ALJ.  And the ALJ did not cite specific record evidence that supported his physical RFC assessment; while the articulated limitations may be supported by the record, he did not identify what supporting sources he relied on, and he specifically rejected the opinions of the state consultant reviewers who found no physical limitations.

The Magistrate Judge also found that the ALJ did not adequately explain why he gave "some" weight to Dr. Zarnowiecki's opinion about Hammock's psychological limitations while giving "great weight" to the state examiner, Dr. Chiappone.  Yet a comparison of the specific functional limitations found by both Zarnowiecki and Chiappone shows that they did not significantly differ in their opinions.  Both concluded that she was moderately impaired in areas of relating to co-workers and supervisors, and in her ability to maintain concentration and attention.  But the ALJ credited Dr. Chiappone's conclusion that she was "only" moderately impaired in several functional categories, while discounting Dr. Zarnowiecki's essentially identical findings.  Both doctors stated that her anxiety would affect her ability to hold a job (while using slightly different terminology), but the ALJ did not discuss those conclusions.

Given the Sixth Circuit's repeated enforcement of regulations that require an explanation of "good reasons" for discounting a treating physician's opinion, this Court agrees with the Magistrate Judge that the final decision in this case fails to comply with that requirement.

Harmless Error

The Commissioner also argues that any error by the ALJ in failing to explain the weight given to Hammock's treating sources was harmless.  The Sixth Circuit has found that such a failure may be considered harmless error if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it; or if the Commissioner essentially adopts the treating source's opinion or makes findings consistent with it; or where the decision effectively satisfies the goal of the rule but does not comply with the specific terms of the regulation.  Wilson v. Comm'r of Soc. Sec., 378 F.3d 541, 547 (6th Cir. 2004).  The Commissioner argues that Hammock's treating source opinions are patently deficient and therefore not creditable under any circumstances.

The Court agrees with the Magistrate Judge that the failure to explain the specific reasons for discounting the treating physicians' opinions is not harmless.  The medical evidence and objective findings concerning Hammock's acknowledged impairments are not so one-sided that their assessments are not worthy of any credence.  While the Commissioner notes some evidence that detracts from those assessments (such as normal neurological exams, or Dr. Ahmed's note that she had good range of motion two months post-surgery), there is also evidence that supports their assessments (such as her report of increased knee pain despite a cortisone shot in September 2010, the episodic nature of her psoriasis, and continuing complaints of arthritis pain).  Moreover, the ALJ accepted Dr. Hunter's diagnoses of Hammock's various impairments, but did not adequately explain the basis for rejecting his opinion about her work limitations.  On remand, the ALJ should cite the specific evidence used to support his conclusions with

respect to the specific weight accorded to Hammock's treating physicians.

2.　　Hammock's Credibility

In her second claim of error, Hammock argues that the ALJ improperly evaluated

her credibility.  An ALJ's credibility assessment must be supported by substantial

evidence; but "an ALJ's findings based on the credibility of the applicant are to be

accorded great weight and deference, particularly since an ALJ is charged with the duty

of observing a witness's demeanor and credibility."  Walters v. Comm'r of Soc. Sec.,

127 F.3d 525, 531 (6th Cir. 1997).  The ALJ's credibility assessment cannot be

disturbed "absent a compelling reason."  Smith v. Halter, 307 F.3d 377, 379 (6th Cir.

2001).  Discounting the claimant's subjective testimony is entirely proper if there are

contradictions between a claimant's testimony, her reports to examining sources, or the

objective clinical evidence.  Warner v. Comm'r of Soc. Sec., 375 F.3d 387, 392 (6th Cir.

2004).

Factors that are relevant to the evaluation of a claimant's descriptions of

symptoms include her daily activities; the location, duration, frequency, and intensity of

symptoms; factors that precipitate and aggravate symptoms; the type, dosage,

effectiveness, and side effects of medication taken to alleviate the symptoms; other

treatment obtained or steps taken to relieve symptoms (such as lying on one's back, or

alternating standing and sitting); and any other factors bearing on the claimant's

limitations.  See 20 C.F.R. 416.929(c)(3).  Consistency in a claimant's statements is a

"strong indication" of the claimant's credibility: "The finding on the credibility of the

individual's statements cannot be based on an intangible or intuitive notion about an

individual's credibility. The reasons for the credibility finding must be grounded in the

evidence and articulated in the determination or decision."  Soc. Sec. Pub. 96-7p, 1996 SSR LEXIS 4 at *11.

Hammock contends that the ALJ's conclusion that she was not entirely credible is contradicted by both Dr. Chiappone and the state reviewer (Dr. Zwissler), who both found her credible and to whose opinions the ALJ generally accorded great weight.[4] The ALJ cited her hearing testimony that she spent six days a week essentially alone, but noted that she previously lived with friends, and she went to doctors' appointments and went shopping once a week.  He noted a purported discrepancy between her hearing testimony that she did not see her brother and his family, and the fact that a nephew took her to the appointment with Dr. Chiappone, and she reported in May 2010 that another nephew may have exposed her to a stomach illness (TR 349).  And he cited physical examinations that "routinely showed the claimant was neurologically intact with no muscle wasting, good strength and normal sensation," and her own report that she was able to tend to personal care and slowly complete some daily chores.  (TR 17)

While the ALJ's credibility determinations are generally entitled to great deference from this Court, the ALJ cited one purported contradiction that directly affects his residual functional capacity assessment.  The ALJ rejected Hammock's hearing testimony that she suffers "daily" panic attacks that left her sweating or shaking, and at times incapacitated.  She reported to Dr. Chiappone that she had daily panic attacks,

---

[4] Dr. Chiappone noted in his report that "She did not appear to exaggerate or minimize her complaints.  The history she provided appeared to be accurate, credible, and consistent."  (TR 271)   Dr. Zwissler concluded that her psychological symptoms would likely be exacerbated by stressors, and that her statements "appear to be credible."  (TR 293)

but the ALJ relied on her report to Dr. Hunter on November 2, 2009 that she was having three attacks per week but was "learning to deal with it." The ALJ did not reach a specific conclusion based upon the entire record about the credibility of Hammock's reports of **regular** panic attacks. This is critical to the RFC analysis because the ALJ specifically asked the vocational expert about panic attacks: "At what level of frequency do you think that would cause a problem work-wise, if the individual was having a panic attack and it disrupted their work, say, anywhere between 15 minutes and an hour. Would that be a problem if that happened once a week, twice a week?" The VE responded, "I would think any more than once or twice a month. If it was happening on a regular basis, it would become an insurmountable work problem." (TR 62)

The ALJ did not address this testimony, nor make a specific determination as to whether or not Hammock's description of "regular" panic attacks (e.g., more than once or twice a month) was credible. Such a determination is critical to the RFC formulation. Her medical records clearly document a consistent history of reports about such attacks, and she has received consistent treatment for anxiety. And both Dr. Chiappone and Dr. Zwissler found her reports and statements to be credible. In view of the VE's testimony, this issue requires further explanation. On remand, the ALJ should review the entirety of the evidence and testimony on this issue, and make specific findings on the extent of Hammock's reported anxiety and panic disorder, and whether panic attacks would render her effectively precluded from employment, as the VE testified.

## CONCLUSION

The Court agrees with the Magistrate Judge's Report and Recommendations, and concludes that the ALJ's decision that Plaintiff is not entitled to benefits was not

supported by substantial evidence.  The final decision of the Commissioner is therefore reversed, and this matter is remanded pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this order, in particular to specifically explain the basis for the weight given to Hammock's treating physicians, to evaluate the evidence concerning the frequency of Plaintiff's reported panic attacks, and to formulate an appropriate RFC assessment in light of that evidence.

  SO ORDERED.

  THIS CASE IS CLOSED.

Dated: August 13, 2013          <u>s/Sandra S. Beckwith</u>
                Sandra S. Beckwith, Senior Judge
                United States District Court